UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

In re                                                      :          Chapter 11
                                                           :
NUSSBAUM LOWINGER LLP,                                      :          26-22383
                                                           :
                          Debtor.                          :

-------------------------------------------------------------------X

In re                                                      :          Chapter 11
                                                           :
MARK J. NUSSBAUM AND ASSOCIATES, PLLC,   :          26-22384
                                                           :
                          Debtor.                          :

-------------------------------------------------------------------X

### DECLARATION OF EPHRAIM DIAMOND IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION

I, Ephraim Diamond, in accordance with 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Chief Restructuring Officer of Nussbaum Lowinger LLP (the "**Partnership**") and Mark J. Nussbaum and Associates, PLLC (the "**PLLC**," and together with the Partnership, the "**Debtors**")

2.      I am familiar with the affairs of the Debtors.

3.      I am the founder and managing member of Arbel Capital Advisors LLC ("**Arbel**"), an independent restructuring and fiduciary advisory firm I established in 2018. Prior to founding Arbel, I spent a decade as a Director and Senior Legal Analyst at Davidson Kempner Capital Management, LP, where I was the founding legal analyst for distressed strategies across asset classes. Earlier in my career, I practiced as a corporate bankruptcy associate at Paul, Weiss, Rifkind, Wharton & Garrison LLP, representing debtors, creditors, and lenders in Chapter 11 proceedings and out-of-court restructurings. I received my J.D. from New York University School

of Law and am admitted to practice in New York State and Federal Courts, the Supreme Court of the United States, and am a Part 36 Certified Receiver.

4.     Since founding Arbel, I have been retained by courts, creditors, boards, and companies to serve as Chief Restructuring Officer, court-appointed receiver, independent director, independent manager, and litigation oversight board member across a range of complex and often contested situations. My engagements frequently involve governance-sensitive environments, including matters arising from allegations of fraud or misconduct by principals, where the role requires establishing independent oversight, stabilizing operations, and working through competing claims among lenders, investors, and other stakeholders. In these engagements, I work closely with boards, restructuring counsel, financial advisors, and brokerage professionals—coordinating process, preserving independence, and aligning stakeholder objectives while enabling each professional team to execute effectively within its respective role. I currently serve on the Endo GUC Trust Litigation Oversight Board and the Mallinckrodt General Unsecured Claims Trust Litigation Advisory Board, and previously served as Independent Director of the Nine West Litigation Trust, as well as Independent Director of Ford Models, Inc. and Independent Board Member of Abri Healthcare.

5.     On the restructuring side, I have served as Chief Restructuring Officer or Associate Restructuring Officer in a number of large and complex engagements involving real estate and multi-layered capital structures. In the aggregate, I have been involved in restructurings representing over $2.5 billion in real estate assets and funded debt. Most recently, I served as Chief Restructuring Officer for Zarasai Limited Holdings/Pinnacle Management, a real estate platform comprising more than 8,000 rent-stabilized units and over $1 billion in funded debt, including TASE-listed bonds, where I acted as CRO for a 5,200-unit sub-portfolio in Chapter 11, overseeing

operations, implementing disciplined cash management, and coordinating restructuring efforts among lenders, bondholders, and other stakeholders. I also served as Associate Restructuring Officer for All Year Holdings Limited, a 125-building portfolio with over $1.3 billion in funded debt, where I was involved in cross-border insolvency proceedings across three jurisdictions, investigated insider self-dealing, and helped structure creditor resolutions culminating in a full company sale.

6.      I was formally engaged by the Debtors in late March 2026 to serve as Chief Restructuring Officer for each of the Debtors.  Although recently retained, I was initially approached six months ago regarding this potential engagement, with those discussions just recently being renewed.  Thus, I am knowledgeable about the issues facing by the Debtors.

7.      Under the engagement letter between Arbel and the Debtors, I, as Chief Restructuring Officer, have complete authority over all aspects of administration of the Debtors' cases, and cannot be removed by Nussbaum (defined below) except by order of this Court, at which Nussbaum would be required to establish cause.   I have filed these chapter 11 cases on behalf of the Debtors to fulfill certain core objectives:

(a) **Transparency and Investigation**: A comprehensive and deliberate investigation into the Debtors' pre-petition conduct, including claims asserted by parties in interest;

(b) **Asset Recovery:** Identifying potential assets (including litigation claims) and determining the best strategy to promptly commence any appropriate actions to recover such assets; and

(c) **Maximizing Value**: Determining how to best maximize value for all stakeholders through a liquidation plan.

8.      I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these Chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") and in support of the Debtors' voluntary petitions

for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**").

9. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with representatives of the Debtors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial affairs and condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

10. This Declaration is intended to provide a summary overview of the Debtors' business, history, and organizational structure, prepetition indebtedness, and the circumstances giving rise to the commencement of these Chapter 11 Case.

**A. The Debtors' Corporate Structure**

11. The PLLC is a New York private limited liability company formed in 2016, with Mark J. Nussbaum ("**Nussbaum**") as its sole member.

12. The Partnership is a New York limited liability partnership formed in 2021 between Nussbaum and Samuel Lowinger ("**Lowinger**"). In 2025, Lowinger withdrew from the Partnership, and thus Nussbaum is currently the sole partner of the Partnership.

**B. The Debtor's Business**

13. The PLLC was created by Nussbaum to provide legal services, primarily in the area of commercial real estate and related business areas. I understand that Nussbaum created the Partnership with Lowinger, who had been working with Nussbaum as an associate at PLLC, and that following the formation of the Partnership, most or all legal services were conducted through the Partnership.

C. **Key Events Leading to Debtors' Chapter 11 Filing**

14. Although the Debtors were formed for the purpose of providing legal services for clients in numerous real estate and business transactions, based upon my review and investigation to date, I understand that the Debtors engaged in a number of other lines of business that ultimately resulted in this bankruptcy filing. These lines of business can be broken down into the following categories: hard money lending, liquidity enhancement loans and short term bridge loans.

15. Hard money loans are loans made in circumstances where regular bank financing is either not available or not available on the timeline required. These loans typically carry higher interest rates and oftentimes are secured with collateral. Liquidity enhancement loans consist of loans to a party to a transaction who needs to demonstrate to third parties that they have sufficient funds as part of the proposed transaction. Finally, short term bridge loans are loans made to bridge liquidity shortfalls at the time of a closing for a transaction.

16. The source of funds for these transactions, I understand, came from a number of discrete and distinct buckets. Some funds were expressly loaned to the Debtors and deposited into the Debtors' escrow accounts, with the understanding that such funds would be lent out by the Debtors to third parties. Other funds were loaned to the Debtors with a caveat that the funds would not be explicitly used, but rather would remain in the Debtors' escrow accounts. Either way, the providers of these funds were promised substantial returns for use of their funds and, in fact, received payments. Over the years, hundreds of millions of dollars were "loaned," "interest" paid and "principal" "repaid." The exact nature of these transactions has yet to be determined.

17. It is my understanding that starting in mid to late 2022, most of the funds flowing into the Debtors' escrow accounts were being used to support a single client. This client was unable to repay the funds it received, and this ultimately resulted in the depletion of the escrow

**Page 5**

accounts to such an extent that the Debtors lacked sufficient funds to close pending real estate transactions where a client had previously escrowed sufficient funds with the Debtors for such transaction.   Upon this coming to light, in January 2025, the Debtors ceased all operations.

18.    Following the closure of the Debtors, many of the Debtors' former clients and other creditors filed litigation against the Debtors and Nussbaum, individually, arising from the Debtors' practices with respect to the funds placed in the Debtors' escrow accounts.  *See* Schedule A hereto.

19.    Last year, the Debtors considered various options to wind down its affairs, including filing for bankruptcy.   After consulting with certain of the constituent parties, the Debtors ultimately decided to proceed with an assignment for the benefit of creditors pursuant to Article 2 of the New York Debtor and Creditor Law.

20.    In June 2025, the Debtors executed an assignment agreement, effecting an assignment for the benefit of creditors to ABCMN LLC, a special purpose entity formed for taking on the assignment of which Sheldon Eisenberger of Anderson Kill P.C. (the "**Assignee**") was the sole member.   The Assignee filed a petition commencing the assignment for the benefit of creditors, which is known as Case No. 157933/2025 (the "**ABC Proceeding**") pending in the Supreme Court of the State of New York, New York County (the "**State Court**").   In connection with the appointment of the Assignee, Nussbaum agreed to contribute certain personal assets to the Debtors that the Assignee could then liquidate for the benefit of the Debtors' creditors.

21.    Since the commencement of the ABC Proceeding, it is my understanding that there has been minimal progress made in effecting recoveries or making distributions to creditors. While a few lawsuits have been filed, little to no progress has been made on moving them forward.

22.    Indeed, in February 2026, the Assignee wrote to the State Court asking that matters related to ABC Proceeding be assigned to a different part of the Court as actions requested by the

Assignee, some of which have been pending since June 2025, had not been resolved by the State Court. The State Court has yet to respond to this request or otherwise resolve any of the open matters. This is further evidence of the fact that the ABC Proceeding has effectively stalled.

23. Although the ABC Proceeding has stalled, the multitude of litigation against the Debtors has continued as there is no stay of such litigation arising from the filing of the ABC Proceeding. These litigations are not only a drain on the Debtors but are also proceeding in multiple separate actions before multiple courts, thus creating a risk of conflicting decisions that risk rendering the ABC Proceeding ineffective. The fact that the ABC Proceeding has effectively stalled also runs the risk of protracted delays in recovering assets, primarily through avoidance action litigation, and making distributions to creditors.

24. In light of the foregoing, the Debtors, in consultation with me, have reconsidered how to most efficiently wind down their affairs. There is a need to consolidate and centralize all pending litigation in a forum that could provide a speedier resolution in order to return funds to the hands of creditors as promptly as possible. Accordingly, I commenced these bankruptcy cases in order to achieve these objectives. In this respect, based on my experience, the extensive jurisprudence developed in the bankruptcy courts in adjudicating issues related to the type of conduct described above would be advantageous in resolving the matters from the Debtors' pre-petition activities. It will also provide a useful backdrop for settlement negotiations, which I intend to attempt to pursue to the greatest extent practicable.

**D.      Information Required by Local Bankruptcy Rule 1007-2**

25. In accordance with Local Bankruptcy Rule 1007-2(a)(3), there is no pre-petition committee.

26. In accordance with Local Bankruptcy Rule 1007-2(a)(4), attached as Schedule A is the list of 20 largest unsecured creditors according to my investigation to date.

27. In accordance with Local Bankruptcy Rule 1007-2(a)(5), there are no holders of secured claims.

28. In accordance with Local Bankruptcy Rule 1007-2(a)(6) and (a)(8), all of the Debtors' assets are currently held by the Assignee. The Debtors will terminate the assignment (as contemplated by the assignment document which commenced the ABC Proceeding) due to the initiation of these bankruptcy cases, and such assets will be turned over to the Debtors' estates. Such assets consist primarily of (i) assets transferred by Nussbaum to the Debtors, some of which may have been liquidated to cash, and (ii) claims and causes of action against numerous parties relating to the transfers made from the Debtors' escrow accounts as well as (iii) efforts to collect on receivables from the Debtors' other lines of business. The Assignee's address is c/o Anderson Kill P.C., 7 Times Square, 15th Floor, New York, New York 10036.

29. In accordance with Local Bankruptcy Rule 1007-2(a)(7), there are no publicly held stock or other securities.

30. In accordance with Local Bankruptcy Rule 1007-2(a)(9), the Debtors neither lease premises nor own any real property.

31. In accordance with Local Bankruptcy Rule 1007-2(a)(10), any tangible assets are currently held by the Assignee, but I am presently unaware as to the specific location of those assets, and, with respect to certain assets assigned by Nussbaum to the Debtors pre-petition, such assets are held by Nussbaum at his personal residence at 15 Galileo Court, Suffern, New York 10901. The Assignee is in possession of a copy of the books and records of the Debtors, and the

original books and records are located at 15 Galileo Court, Suffern, New York 10901. To my knowledge, there are no assets outside the territorial limits of the United States.

32.     In accordance with Local Bankruptcy Rule 1007-2(a)(11), Schedule A provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property known to me. With respect to these actions, to my knowledge, a judgment has not been issued against the Debtors and a seizure of their property is not imminent in any of the actions.

33.     In accordance with Local Bankruptcy Rule 1007-2(a)(12), as noted above, I am the Chief Restructuring Officer and have sole control over all decision-making and other matters relating to the Debtors. Accordingly, Nussbaum has no ability to provide any direction to me nor does Nussbaum have any control over the Debtors.

I, Ephraim Diamond, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2026.

_____
Ephraim Diamond

Schedule A

Litigation

| Case Number | Court | Plaintiff | Defendant | Description of Claim |
|---|---|---|---|---|
| 150366/2025 | New York Supreme Court, New York County | GAHC3 Mount Dora FL MOB II, LLC | Nussbaum Lowinger LLP | Alleged Voidable Fraudulent Transfers |
| 652179/2025 | New York Supreme Court, New York County | CF Encore Purchaser LLC | Nussbaum Lowinger LLP, et al. | Alleged Fraudulent Scheme Perpetrated Against Lender |
| EF2026-661 | New York Supreme Court, Ulster County | Modena Developers LLC | Nussbaum Lowinger LLP, et al. | Termination of Restrictive Covenant to which Debtors must consent |
| 545570/2025 | New York Supreme Court, Kings County | Akiva de Greon | Nussbaum Lowinger LLP, et al. | Malpractice |
| 035445/2025 | New York Supreme Court, Rockland County | Levi "Lee" Needleman | Nussbaum Lowinger LLP, et al. | Malpractice |
| 032678/2025 | New York Supreme Court, Rockland County | Yehuda Lasry | Mark J. Nussbaum and Associates PLLC, Nussbaum Lowinger LLP, et al. | Unknown – Only a summons on file |
| 602733/2025 | New York Supreme Court, Rockland County | Yehuda Lasry | Mark J. Nussbaum and Associates PLLC, Nussbaum Lowinger LLP, et al. | Breach of Duty; Negligence |
| 508496/2025 | New York Supreme Court, Kings County | 703 Funding B, LLC and Shimon Braun | Mark J. Nussbaum and Associates PLLC, Nussbaum Lowinger LLP, et al. | Unknown – Only a summons on file |